A. J. GUNDERSON, Plaintiff-Appellant,

v.

FRIDEN, INC., Defendant-Appellee.

No. 16711.

United States Court of Appeals
Sixth Circuit.

Feb. 10, 1967.

John P. Sandidge, Louisville, Ky., Robert P. Hobson (Deceased), Woodward, Hobson & Fulton, Louisville, Ky., on brief, for appellant.

Stuart A. Handmaker, Louisville, Ky., Kenneth S. Handmaker, Milliken, Handmaker & Rosenstein, Louisville, Ky., Petty, Andrews, Olsen & Tufts, San Francisco, Cal., on brief, for appellee.

Before WEICK, Chief Judge, CELEBREZZE, Circuit Judge, and THORNTON *, Senior District Judge.

CELEBREZZE, Circuit Judge.

In a jury trial, Mr. A. J. Gunderson sought to recover compensation from Friden, Inc. for his efforts to lease collectadata processing equipment to American Radiator and Standard Sanitary Corporation (American-Standard). During the presentation of Mr. Gunderson's case the District Court sustained Friden's motion for a directed verdict. From this adverse judgment, Mr. Gunderson (hereinafter referred to as Appellant) appeals.

Appellant was employed by Friden in 1944 to sell calculating machines in the Louisville-Lexington, Kentucky area. In 1962, Appellant became a branch manager, in charge of the sales and service organization for Louisville-Lexington.

In 1960, Appellant showed American-Standard a Model 2 Collectadata Machine. While American-Standard was interested in a collectadata machine, it wanted a machine which was more flexible than the Model 2. Appellant informed American-Standard that Friden was coming out with a new collectadata unit, Model 30, which soon was to go into production. The Model 30 was to perform at twice the speed of the Model 2, and was designed to transmit information relating to accounting, attendance and inventory.

On July 18, 1961, American-Standard entered into a lease agreement with Friden whereby it would lease the equipment comprising Model 30. After preliminary work was done by American-Standard, Friden and Appellant, in preparation for the delivery of the equipment, the first machines were installed in November, 1961. The machines could not accurately transmit the information, and they were sent back in December, 1961. More equipment was sent to American-Standard in January, 1962. Again, the machines made too many errors. Design engineers from Friden worked with American-Standard in an effort to "d-bug" the machines. These efforts failed, and new machines were sent in July, 1962, and again in the fall of 1962. The machines failed to function properly, and the last try was made with new machines in January, 1963. These machines were costly, and both American-Standard and Friden hoped to adjust the machines to the needs of American-Standard. This proved to be impossible, and American-Standard finally gave up and canceled the lease agreement. Since the machines never functioned properly, no lease rental was ever paid by American-Standard. American-Standard had an option to buy the machines, but, of course, this option was never exercised. The net result was a financial loss for American-Standard, Friden and Appellant.

Friden maintains that under its contract with Appellant, it was not obligated to pay any commissions to Appellant. In the contract between Appellant and Friden, Friden agreed to pay a commission to Appellant

"at the respective rates specified in the schedule attached hereto (and/or in schedules which may hereafter, from time to time, be signed by each of us and attached hereto), on the net rental actually received by us (or one of our subsidiaries or divisions) on products specified in such schedule or schedules which are delivered to you hereunder and rented by you on orders accepted and invoiced by us (or one of our subsidiaries or divisions, when appropriate), * * *."

* Hon. Thomas P. Thornton, Senior District Judge, United States District Court, Eastern District of Michigan, sitting by designation.

The schedule dated January 1, 1961, provided, in part:

"No commission will be paid on the first six months' payments on leases which are canceled prior to the stipulated minimum period.".

The "minimum period" referred to in the master lease agreement between Friden, Inc. and American Radiator and Standard Sanitary Corporation is defined in paragraph 1, which provides:

"1. The lease of each machine shall commence on the day such machine is installed ready for your use, and shall continue for a minimum period of 1 years, and thereafter until terminated by either of us upon 30 days' written notice."

Thus it is apparent from this contract that Appellant's right of recovery depended upon certain conditions precedent:

First: That the net rental must actually have been received by Friden or its subsidiaries or divisions, and

Second: That the period of rental must exceed six months of canceled prior to the one year minimal period, or

Third: In the event of sale—when payment in full has been received.

In granting Friden's motion for a directed verdict, the District Judge said:

"Again under the evidence in this case, no money, and no rental, was ever received by the defendant for the equipment for the reasons that you have heard. And in the absence of some bad faith on the part of the defendant Friden and Company, in its relations with its—with the plaintiff, the plaintiff is bound by that condition of its contract. Since Friden received no net rentals, the plaintiff cannot be compensated. Now, I realize that this motion is being sustained prior to the admission of testimony of all the plaintiff's evidence. But in view of his forthright statement that there will be no showing of such bad faith, I have precipitated the matter by granting the motion at this time."

The parties here agreed that their contract was to be construed and enforced in accordance with the laws of California. Under California law, a right to a commission must be measured primarily by the terms of the agreement. Bieg v. Shamel, 129 Cal.App.2d 700, 277 P.2d 842 (1954). In Cochran v. Ellsworth, 126 Cal.App.2d 429, 272 P.2d 904 (1954), the agent's agreement provided for the payment of a commission on consummation of the sale. The buyer's unjustified and unenforceable demand to backout was agreed to by the seller. The Court first found that consummation meant payment of the purchase price and conveyance of title. In holding that no commission was due under the contract, the Court said:

"When a condition precedent is adopted by the parties to a contract, the court will exact a substantial if not strict observance of the provisions before finding liability.

\*   \*   \*   \*   \*   \*

"Where broker has seen fit to allow payment of his compensation to be contingent upon performance of a contract between parties other than himself, he cannot complain if, through the nonperformance of that contract, his own contingent rights be lost."

See also Hodges v. Lewis, 112 Cal.App. 2d 526, 246 P.2d 676 (1952), and Uhlmann v. North Whittier Highlands, Inc., 167 Cal.App.2d 758, 334 P.2d 1022 (1959).

Under California law, the contract between Friden and the Appellant must be strictly construed. Full force must be given to the condition that Friden receive the first six months' rentals, before a commission is due to the Appellant. Here the parties were attempting to lease or sell expensive equipment which was not only a new product, but also was a product which to a certain extent had to be tailored to the needs of American-Standard. Thus a certain risk was involved on the part of Friden and the Appellant. While a contract entered into for the sale or rental of a product may

contain therein an implied understanding that the product which is the subject of the sale or rental is functional and usable, this would not be true here where the product is in the experimental stage and such knowledge is possessed by the parties to the contract.

■ The testimony adduced established that Appellant was aware that this was a new product which had not been fully tested; that there were numerous attempts made by Friden to make it work, and Appellant admits that there was no bad faith on the part of Friden. Having agreed to accept the responsibility under the existing contract of employment it became incumbent that he was bound by the terms of the contract. The terms not having been fully complied with, no recovery can be had.

Appellant also appeals from a judgment entered in favor of Friden on Friden's motion for summary judgment. Appellant sought to recover rentals claimed due as a result of a letter sent to Appellant by Friden. The District Court held the letter did not comply with the Kentucky Statute of Frauds, K.R.S. 371.010.

A reading of the record indicates that the lease in question was entered into between one Waterman and Appellant. Appellant then sublet to Friden on a month to month basis. Friden wrote to Appellant, requesting a change on the part of Friden from that of sublessee to prime lessee. The letter indicates there was no meeting of the minds in view of the last paragraph which said:

"To sum it up, if there is no other recourse than to sublet, we would further consider the matter. We are merely outlining our preference in the matter."

■ Even if we determine that the letter was a modification of the existing lease, it would not satisfy the Kentucky Statute of Frauds, K.R.S. 371.010, which provides, in part:

"No action shall be brought to charge any person: * * * (b) Upon any contract for the sale of real estate, or any lease thereof for longer than one year * * * unless the promise, contract, agreement, representation, assurance or ratification, or some memorandum or note thereof, be in writing and signed by the party to be charged therewith, or by his authorized agent."

The question before the Court is whether this letter is or is not a "memorandum or note" of the lease within the meaning of the statute quoted above.

"It is the rule in this state that the subject matter of a contract must be contained in the contract, and the writing or memorandum relied on must afford the means of identification. Unless it does, the contract is within the statute of frauds." Beckett-Iseman Oil Co. v. Backer, 165 Ky. 818, 178 S.W. 1084 (1915).

"It is not enough that there should be a writing * * * describing the premises, upon certain terms to be mutually agreed upon; but the memorandum relied upon must contain the terms * * * the terms of the lease, the time it is to begin, the conditions upon which it is to be executed, the various provisions setting forth the respective rights, duties and obligations of the contracting parties, are of the very essence of the contract, and they must necessarily be reduced to writing in order to take the case out of the statute. These are the pivotal points upon which the question of leasing would turn." McKnight v. Broadway Investment Co., 147 Ky. 535, 145 S.W. 377 (1912).

The letter in question contains none of the requisite recitations. In the letter, there is no description of the premises or of the beginning date or of the ending date, or of any of the terms. In fact, it stated in clear and unequivocal language:

"However, we have no intention of entering into the lease directly and sitting down and writing a check to you in the amount you list."

Friden made it perfectly clear that it had no intention of entering into a lease between itself and Gunderson.

 Appellant does not dispute the necessity of his lease being in writing under K.R.S. 371.010(6). Since this is true, the modification thereof must also satisfy the requirements of the statute, to-wit: It must contain all the essential elements or material parts of the contract. Purcell v. Campbell, 261 Ky. 644, 88 S.W.2d 670 (1935). Clearly, the letter does not so provide.

Affirmed.